IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                            Case No. 18-10095-01-JWB

CHRISTIAN DELGADO-LOPEZ,

        Defendant.

**MEMORANDUM AND ORDER**

This matter came before the court on November 19, 2018, for an evidentiary hearing on Defendant's motion to suppress (Doc. 14.) The motion has been fully briefed and the court is prepared to rule. (Docs. 24, 25.) For the reasons stated herein, Defendant's motion is DENIED.

**I. Facts**

In the early evening of Sunday, June 3, 2018, Kansas Highway Patrol Trooper James Cody Parr was patrolling on U.S. Highway 54 in Meade County, Kansas. Parr, who was westbound on the two-lane highway, passed by a white pickup truck traveling east. The truck was driven by Defendant Christian Delgado-Lopez. In his review mirror, Parr saw the truck's tires cross the center line of the highway for about two seconds. Parr turned around, pursued the pickup, and conducted a traffic stop. The truck, a newer model Ford F-150 with a California license plate, pulled over on the shoulder.

Parr approached the passenger side of the truck and explained to Defendant and his passenger that he made the stop because he saw the truck cross the center line and wanted to make sure the driver was not impaired, texting, or falling asleep. Defendant assured him that was not the case. Parr requested Defendant's license, which he produced with some difficulty, as his hands

were shaking. Parr noted the license was from California and asked Defendant and his passenger, Brandon Wade, what brought them to Kansas. Defendant said they were on their way to Wichita, to which Parr asked whether it was business or vacation. Defendant and Wade both answered "vacation." Parr laughed and said, "no way." Parr could see that Wade was visibly sweating. Parr told Defendant to come back to the patrol car while he checked his information. Defendant got out of the truck, shook hands with Parr (who introduced himself), and got in the front passenger seat of the patrol car. Parr had not yet called in information on the truck because there had been radio traffic as he was making the initial stop.

Parr began entering information on a laptop that allowed him to check on Defendant's driver's license and determine if he had any outstanding warrants. As he did so, the two men conversed. Parr asked about Dana Point, California, Defendant's hometown. He also asked Defendant what he was going to do in Wichita, to which Defendant said he was going to visit family with his friend Brandon. Parr asked who had family in Wichita. Defendant said Brandon did, but that he (Defendant) did not. Parr also asked Defendant if he owned the pickup; Defendant said it was a rental. Parr asked who rented it, to which Defendant said Brandon did but they were both on the agreement. Parr asked what family Brandon had in Wichita and whether he grew up there. Defendant indicated his friend did not grow up in Wichita and that he was "pretty sure it's probably like an aunt or an uncle." Parr asked how long they were going to stay; Defendant said just a couple of days. Parr looked up Dana Point on his computer as the two talked. Defendant indicated that he and Wade grew up together.

Parr went to the passenger window of the truck to get the rental agreement from Wade. Wade produced a copy of the agreement on his phone. His hands were trembling as he did so. Wade said he had rented the truck and that Defendant was also listed on the agreement. When Parr

2

noted that not many people came to Wichita for vacation, Wade said they were just "going to check it out." Parr asked if Wade had family or friends there; Wade said no. Parr examined the agreement and noted the truck had been rented the day before (June 2) and was due back in California on June 5.

Parr returned to the patrol car and asked Defendant what day the pickup was due back. Defendant indicated it was two days later, on Tuesday. When Parr observed that it would take two days just to get there, Defendant said they would probably call in and get an extension. Parr radioed in the license plate information on the truck. He received a report back indicating the license and registration were valid. Parr asked if there were any firearms in the truck; Defendant said there were not. Parr began typing up a "digi-ticket" warning citation before radioing in a request for a "Triple I" criminal history check on Defendant.

Parr returned to the pickup again and asked Wade if he could check his I.D. since he was on the rental agreement. Wade said "of course" and produced his driver's license. Parr returned to the car and asked Defendant if they had hotel reservations. Defendant said yes, but when Parr asked where, Defendant said they would figure that out when they got there and they were "just going to go with his [Wade's] family." Parr received a dispatch indicating Defendant's license was valid and he had no criminal history. In response, Parr asked for a Triple I criminal history check on Wade. Parr finished typing in the information for a warning citation and printed out the ticket.

Parr said he was waiting on a return report from dispatch as he handed Defendant his license, the warning ticket, and Wade's license. Parr said "you are free to go," but asked if he could ask Defendant a few more questions "before you take off." Without hesitation Defendant said, "Sure." Parr asked whether he had anything illegal in the pickup; Defendant said no. At that point Parr received the dispatch report stating that Wade had no criminal history other than a 2010 DUI.

3

Parr again told Defendant he was free to go, before asking whether there was any marijuana, methamphetamine, cocaine, or heroin in the truck. Defendant responded no to each of these questions. Parr then asked, "May I search the pickup?" to which Defendant immediately said, "Yes, if you want." Parr said, "It would be alright?" Defendant again replied without hesitation in a positive tone, "Yeah." Parr told Defendant to "hang out here for a second" as he got out of the patrol car and began a search.

Parr went back to the truck and told Wade that his and Defendant's "stories don't match" and that Defendant gave him permission to search the truck. He asked Wade to wait out in front of the truck as he searched, to which Wade responded, "of course," and got out of the truck. Parr then engaged in an extensive search of the truck, including through the luggage, behind the seats, through the bed, and in various crevices. About fifteen minutes into the search, another officer arrived and assisted by watching Wade. Parr retrieved various tools from the patrol car, including a screw driver, which he used to remove and replace some paneling on the tailgate or bed area. After about twenty-five minutes of searching, Parr examined a spare tire that was attached under the bed of the pickup. He eventually located a large quantity of methamphetamine hidden in the spare tire.[1] Defendant made no objection and never attempted to revoke his consent, despite the fact that Parr returned to the patrol car several times to retrieve some tools.

**II. Motion to Suppress**

Defendant's motion to suppress argues that Trooper Parr unnecessarily and unreasonably prolonged the traffic stop by asking questions unrelated to the stop. (Doc. 14 at 6.) He argues Parr had no objective reason for asking about or looking up information on Dana Point, California, or for investigating Wade's criminal history. (*Id.* at 8-9.) Defendant also argues that his consent for

---

[1] Government's Exhibit 1, the video recording of the stop admitted at the hearing, contains a glitch that causes a portion of the video to repeat during Parr's search of the spare tire.

4

the search was not freely and voluntarily given. He contends a reasonable person in his position would not have felt free to disregard Parr's request for consent to search and leave the patrol car, such that the consent was a product of an unlawful detention. (*Id.* at 13.)

**III. Analysis**

*A. Traffic stop.*

A traffic stop is reasonable under the Fourth Amendment if (1) it is justified at its inception, and (2) the resulting search and seizure was reasonably related in scope to the circumstances that justified the initial stop. *United States v. Ingram*, 721 F. App'x 811, 816 (10th Cir.), *cert. denied*, 138 S. Ct. 1602 (2018) (citing *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)). Defendant does not claim the initial stop of his vehicle for crossing the center line was unjustified; the court therefore turns to whether the detention was reasonably related in scope to the purpose of the traffic stop.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop … and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id*. A traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket. *Id.* at 1614-15. An officer can ask questions unrelated to the purpose of the traffic stop "so long as [the unrelated] inquiries do not measurably extend the duration of the stop." *Id.* at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* (citation omitted.) Those inquiries typically

5

involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* Like enforcement of traffic codes, these checks are designed to ensure that vehicles on the road are operated safely and responsibly. *Id. See also United States v. Wheaton*, No. 17-10161-JWB, 2018 WL 4409437, at *3 (D. Kan. Sept. 17, 2018) (citing *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005)) (an officer "conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.")

The court first finds that Trooper Parr acted reasonably in requesting Defendant's driver's license. *Rodriguez*, 135 S. Ct. at 1615 (officer conducting traffic stop may check driver's license). While doing so, Parr ascertained that Defendant and his passenger were on their way from California to Wichita, ostensibly for a vacation. Aside from the fact that Parr's initial questions about Defendant's travel clearly did not prolong the stop, such questions were also germane to the reason for the stop, as Defendant's errant driving indicated the possibility of a fatigued or impaired driver. Parr thus had a reasonable basis for asking about Defendant's travel. The court also notes that although two young men driving from California to Wichita for a vacation is obviously not unlawful, it was, as indicated by Parr's comment ("No way"), certainly out of the realm of ordinary experience. More specifically, in response to questioning by the court at the hearing, Trooper Parr testified that, in his experience, it is extremely unusual to encounter individuals from distant metropolitan areas who are travelling for short-duration vacations to places like Wichita, Kansas, without some additional connection to the destination, such as family or friends. Thus the divergent stories offered by Defendant and Wade regarding Wade's family connection to Wichita became all the more important in the reasonable suspicion calculus. Trooper Parr also testified, and the court finds it credible, that Wade exhibited unusual signs of nervousness during this initial

6

encounter, including visibly sweating. Parr directed Defendant to join him in the patrol car while he ran a check. The court finds this aspect of the detention was reasonable as well. An officer may order a driver to exit his vehicle even without suspicion of a crime, *Penn. v. Mimms*, 434 U.S. 106 (1977), and it was safer and more comfortable for the two to sit in the patrol car rather than converse standing out near the highway.

Defendant contends Parr delayed checking on Defendant's license while asking about travel plans, but the evidence shows Parr promptly started to input information into his laptop to check Defendant's driver's license and whether Defendant had any warrants. Parr engaged in conversation as he did so, which perhaps slowed his typing, but it did not measurably extend the stop beyond what was reasonably necessary. In response to the Trooper's questions, Defendant informed Parr they were going to visit Wade's family in Wichita, that they were going to stay a couple of days, and that the pickup had been rented by Wade. At that point, Parr was entitled to inquire about the pickup, to examine the rental agreement, and to run a check on the registration to make sure Defendant was lawfully operating the vehicle. *See e.g., United States v. Kitchell*, 653 F.3d 1206, 1218 (10th Cir. 2011) (reasonable to examine rental agreement); *United States v. Alvarez*, 68 F.3d 1242, 1244-45 (10th Cir. 1995) (officer may pose questions to vehicle passengers during traffic stop to determine lawful possession of vehicle). This information was gathered within a couple of minutes of when Parr and Defendant first sat in the patrol car. The evidence shows no measurable delay in the stop at that point from asking Defendant questions about his travel.

Parr went to obtain the rental agreement from Wade. In the course of doing so, he asked Wade about the trip, and was told they were coming to Wichita just to "check it out" and that he (Wade) had no family or friends there. That was obviously a direct contradiction of what Defendant

7

had just told Parr. By that point - about seven minutes after the initial stop - Parr had an objectively reasonable suspicion of criminal activity that justified a brief detention to question the two men about their trip. The circumstances known to Parr included that Defendant and Wade were young residents of Dana Point California, which was about 1400 miles away. They were traveling from an area known as a major source of drugs, and were heading to a city with some history as a drug distribution point. They had rented a pickup truck only the day before and had driven over 1,000 miles towards Wichita, Kansas, ostensibly for vacation purposes, but contradictorily said they were going to visit Wade's relatives (Defendant's version), or were just coming "to check it out" despite not having any family or friends in Wichita (Wade's version). The explanation that they were coming to Wichita for vacation was itself somewhat implausible, but all the more so in light of contradictory statements about having family there. The rental vehicle was due back in California two days later. Both men exhibited visible and unusual signs of nervousness that, in the opinion of Parr from his years of experience, exceeded what drivers normally exhibit in a routine traffic stop. Defendant points out that the Tenth Circuit has at times ruled that some of these factors – such as nervousness, implausible travel plans, or evidence that a city is a drug source – have limited significance in the reasonable suspicion calculus. Considering all of these factors together, however, and giving proper deference to the Trooper's assessment of the significance of the factors in light of his experience, the government has shown a particularized and objective basis for the Trooper to suspect that the men were transporting drugs, such that a brief detention to ask further questions about travel plans was reasonable under the Fourth Amendment. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) (although each factor alone was susceptible of innocent explanation, reasonable suspicion need not rule out the possibility of innocent conduct, and taken together the factors warranted a detention).

After obtaining the rental agreement, Parr confirmed that the truck's registration was proper, and he continued entering information in his laptop for a warning citation. He asked Defendant a few more questions and radioed for a Triple I (criminal history) check on Defendant.[2] The circumstances described above warranted a detention for Parr to check on whether Defendant or Wade had any criminal history. In response to Parr's further questioning, Defendant was vague and inconsistent about whether the pair had hotel reservations in Wichita. He first said they had reservations, but when asked where, he said they were going to figure it out when they got to Wichita and would just "go with his [Wade's] family." Such statements only added to the reasonable suspicion the Trooper had about the purpose of the trip and whether it involved transportation of drugs. At about eleven minutes after the initial stop, Parr was informed by dispatch that Defendant's license was valid and he had no criminal history. Parr then radioed in a request for a Triple I check on Wade, before printing out a warning citation and asking Defendant for consent to search the truck. Any delay to that point resulting from Parr asking about the trip, checking criminal backgrounds, or asking for consent was both minimal and reasonably justified by articulable facts suggesting the two might be transporting drugs. *See United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (officer may detain driver for questions unrelated to the stop if he has an objectively reasonable and articulable suspicion illegal activity is occurring).

### B. Consent to search

Voluntary consent is a recognized exception to the Fourth Amendment's requirement that searches must be conducted pursuant to a warrant and probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The voluntariness of a defendant's consent to search "is a question of

---

[2] The evidence indicates that Parr confirmed the validity of Defendant's license earlier in the stop by entering Defendant's license information into his laptop. The inquiry noted above included an additional check to determine whether Defendant had any Triple I record.

9

fact to be determined from the totality of all the circumstances." *United States v. Ramos*, 723 F. App'x 632, 639 (10th Cir. 2018), *cert. denied,* No. 17-9203, 2018 WL 2725957 (U.S. Oct. 1, 2018) (quoting *Schneckloth*, 412 U.S. at 227)). "The government bears the burden of showing the consent was voluntary by (1) proffering clear and positive testimony that consent was unequivocal and specific and freely given and (2) proving that this consent was given without implied or express duress or coercion." *United States v. Flores*, 641 F. App'x 817, 821 (10th Cir. 2016) (quoting *United States v. Salas*, 756 F.3d 1196, 1203 (10th Cir. 2014)). In determining whether consent was voluntary, some relevant considerations include:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the [person who gave consent], the number of officers on the scene, and the display of police weapons. Whether an officer ... obtains consent pursuant to a claim of lawful authority, or informs [someone] of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Id.* (quoting *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012)).

The court finds that Defendant's consent for a search of the pickup truck was given freely and voluntarily. The evidence, including the video recording of the stop, shows without question that Defendant unequivocally and expressly consented to a search. The evidence also shows that he did so of his own free will rather than as a result of improper coercion. The evidence showed that Trooper Parr, the only officer present when Defendant gave consent, was unfailingly polite and professional throughout the encounter and that he and Defendant engaged in friendly conversation. The officer used no physical mistreatment, threats, promises, inducements, trickery, or an aggressive tone or manner to obtain consent. He asked for permission ("May I search the pickup?") rather than suggesting he had the lawful authority to search. The evidence indicated Defendant is an intelligent and articulate young man who readily agreed to the Trooper's request.

Defendant contends the consent was involuntary, among other reasons, because the Trooper unlawfully extended the stop without reasonable suspicion. As indicated above, the court rejects the argument that reasonable suspicion was lacking. If Defendant was in fact detained at the time he gave consent to search, such a detention was justified by a reasonable suspicion of drug transportation, and Defendant's consent was nonetheless voluntary. *See United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007) (detention is only one factor in determining whether consent is voluntary); *United States v. Villegas*, 634 F. App'x 625, 631 (10th Cir. 2015) (defendant's presence in police car did not make consent involuntary). Moreover, the evidence showed that the detention ended just before Parr asked for consent to search. Defendant challenges this because the first time Parr told Defendant he was "free to go," the statement was preceded by Parr explaining that he was still waiting for a report from dispatch. But just after Parr made that statement, the dispatcher reported back, and Parr then reiterated to Defendant that he was free to go. The Trooper's return of all Defendant's and Wade's documents and his clear statement a second time that Defendant was "free to go," without qualification, would indicate to a reasonable person that he was free to disregard the Trooper's further inquiries and to leave. Instead, Defendant voluntarily stayed and answered the Trooper's questions. He readily and positively consented to a search when asked. Defendant complains that Parr asked for consent almost immediately after telling Defendant he was free to go, without allowing him time to get out of the car. *Cf. Villegas*, 634 F. App'x at 630 (defendant reaching for the door latch of police car showed she understood she was free to leave.) But regardless of the timing, the unequivocal message to Defendant that he was "free to go" was sufficient to convey to a reasonable person that he was not required to stay and answer questions. *See United States v. Wallace*, 429 F.3d 969, 975 (10th Cir. 2005) (detention ended when officer said to driver sitting in police car, "that's all I've got," followed by request to

search). Moreover, the totality of circumstances, including Defendant's demeanor and willingness to allow the search, shows that his consent was voluntary. For all of the foregoing reasons, the court finds Defendant's consent was voluntarily given. Defendant's motion does not claim that the officer exceeded the scope of consent in searching the truck, so the court need not address that issue.

In sum, the court finds the detention of Defendant and the search of the pickup were reasonable under the Fourth Amendment.

IT IS THEREFORE ORDERED this 28th day of November, 2018, that Defendant's Motion to Suppress (Doc. 14) is DENIED.

\_\_\_s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE